**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| JANE DOE,<br><br>                Plaintiff,<br><br>vs.<br><br>DARREN K. INDYKE AND RICHARD D. KAHN, AS CO-EXECUTORS OF THE ESTATE OF JEFFREY E. EPSTEIN,<br><br>                Defendants. | <u>**COMPLAINT**</u><br><br><br><br>Civil Action No.:<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Jane Doe, by and through her undersigned attorneys, hereby sues Defendants Darren K. Indyke and Richard D. Kahn in their capacity as joint co-executors of the Estate of Jeffrey E. Epstein, and alleges as follows:

<u>**The Parties and Jurisdiction**</u>

1.      This is an action for damages concerning the brutal and multiple rapes, sex trafficking, sexual abuse, physical assault, physical mutilation, intentional and negligent infliction of emotional distress, blackmail, intimidation, fraud, deceit and misrepresentation inflicted upon Plaintiff JANE DOE, by Jeffery Epstein ("Epstein")  and others at his direction and instruction.

2.      Plaintiff has been domiciled in the State of Florida since approximately June 2001 and has been a citizen of the United States since approximately  2011.

3.      Plaintiff is currently a resident of Duval County, Florida, but at all times relevant to Epstein's sexual assaults and other misconduct described hereafter, Plaintiff was a resident of Broward County, Florida.

4.     Plaintiff respectfully requests anonymity due to the highly personal and extremely sensitive nature of these allegations. A motion is being filed contemporaneously with the filing of this Complaint for the Court's consideration.

5.     Plaintiff should be permitted to proceed under a pseudonym because she will have to disclose matters of the utmost intimacy, including various sexual assaults, rapes, the making of pornography without her consent, and genital mutilation.

6.     Plaintiff comes from a devout Muslim family, and the nature of the allegations would bring great shame to her and her family because of their cultural and religious traditions.

7.     It is also likely that the allegations in this case will be highly publicized given that Epstein and his crimes have been highly publicized all across the nation.

8.     Defendants will not be prejudiced by Plaintiff's use of a pseudonym because they will be provided with her real name under protective order so that they can conduct discovery and build a defense.

9.     Defendants Indyke and Khan are co-executors of the Estate of Jeffrey E. Epstein.

10.     Upon information and belief, at the time of his death, Epstein was domiciled in the State of New York, and thus for purposes of federal diversity jurisdiction pursuant to 28 U.S.C. §1332 is a citizen of the State of New York.

11.     According to federal filings and public media reports, Epstein was a man of vast wealth, power, and influence.

12.     Upon information and belief, among his numerous multi-million-dollar residences was the estate located at 388 El Brillo Way, Palm Beach, Florida, 33480 ("Palm Beach Estate").

13.     Epstein died, by apparent suicide, on August 10, 2019, while imprisoned in New York State.

14.     Upon information and belief, the Estate of Jeffrey E. Epstein was opened in the United States Virgin Islands, St. Thomas Division, and is the legal entity responsible for the tortious and criminal misconduct of Epstein described in this Complaint.

15.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 in that this action arises under the laws of the United States, to wit, the federal Trafficking Victims Protection Act, as reauthorized and amended: 18 U.S.C §§ 1591-1595.

16.     In addition, this Court has jurisdiction pursuant to 28 U.S.C. § 1332 in that Plaintiff is a citizen and resident of the State of Florida, the Defendants, in their capacity as Estate co-executors, are citizens of the State in which the decedent was domiciled (here, New York), and the matter in controversy exceeds the sum or value of seventy-five thousand ($75,000) dollars, exclusive of costs and interest. Thus, federal diversity jurisdiction exists.

17.     This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367 over claims arising under the laws of the State of Florida, as they are so related to the claims in this action arising under the laws of the United States as to form part of the same case and controversy under Article III of the United States Constitution.

18.     This Court is proper venue for this action pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events and omissions that give rise to this action occurred in this judicial district.

## General Allegations

19.     The rapes, sexual abuse, physical assault, mutilation, and sex and labor trafficking perpetrated by and/or under the direction of Epstein, which are described in detail below, occurred between January and May 2008.  Additional and related acts of misconduct by Epstein and others working in concert with him continued thereafter.

20.     Plaintiff's current precise age is a matter of some uncertainty. At the time of her birth in Turkey, legal papers were not generated which confirmed her exact date of birth. To the best of Plaintiff's knowledge, her birth year was 1982.

21.     Utilizing this date of birth, Plaintiff was approximately 26 years of age in 2008, when the rapes, sexual abuse, physical assault, and mutilation alleged herein took place.

22.     At that time, Plaintiff was a devout, married Muslim woman of Turkish descent. She was also the mother of a young son who was then eight years old.

23.     For a period extending over five months, Plaintiff was repeatedly raped and sexually assaulted by Epstein, raped and sexually assaulted by others to whom Epstein trafficked her, and forced by Epstein and other persons working on behalf of and/or in concert with  Epstein to pose naked and performing sexual acts for photographs and videos. She was also assaulted, coerced, and subjected to unwanted and unnecessary surgery of her genitals, mutilated, threatened, and sex trafficked, and compelled to engage in trafficking activities in support of Epstein's sex trafficking of other young women and girls.

24.     As a consequence of Epstein's severe and prolonged intentional and depraved misconduct, and the misconduct of others working on behalf of and/or in concert with Epstein, including his agents, servants, and employees, Plaintiff has suffered severe and permanent physical and emotional injury, suffered the termination of her marriage, endured permanent mutilation of her genitals, lost the physical and emotional ability to enjoy intimate physical relationships, and otherwise been damaged.

25.     During this time, Epstein and others working on behalf of and/or in concert with him falsely represented to Plaintiff, with the specific intent to deceive her to her detriment, that, *inter alia*, (a) they possessed powerful and corrupt influence over the Federal Bureau of Investigation,

the United States Department of Homeland Security's Department of Immigration and Customs Enforcement ("ICE"), Florida state and local law enforcement, and other persons of great power, and (b) in the event that Plaintiff ever told anyone or made any report to the authorities, Epstein and/or others working on behalf of and/or in concert with him would use their influence and power, *inter alia,* to have her prosecuted as a prostitute, to take her child away, to destroy her marriage, to expose her to federal immigration authorities, to have her and her family deported, and/or to have her imprisoned.

26.    In addition, Epstein and others working on behalf of and/or in concert with him, repeatedly made the false representations to Plaintiff, both explicitly and implicitly, that if she ever made any reports  about their misconduct she would be murdered or subjected to severe physical harm.

27.    The false and misleading statements described in Paragraphs 25 and 26, above, were made by Epstein and others working on behalf of and/or in concert with him for the express purpose of inducing Plaintiff to remain silent and to withhold pressing criminal or civil complaints or actions against  Epstein or the other persons working on behalf of and/or in concert with him.

28.    Plaintiff reasonably credited these false statements, and genuinely and reasonably feared for the safety of herself and her family, lived in fear thereafter, and, as a direct result of these false and misleading statements and threats by Epstein and others working on behalf of and/or in concert with him, refrained from filing charges or making any reports or claims against Epstein or others working on behalf of and/or in concert with him until she learned of Epstein's death.

29.    Prior to 2008, during that year, and through the present, Plaintiff  did not regularly follow news or public affairs and  was unaware of the legal and criminal matters relating to Epstein,

including Epstein's 2008 felony plea agreement, his subsequent  incarceration, his release thereafter, his later arrest in July 2019, or his death while in custody on August 10, 2019.

### A.        Epstein's Pattern of Criminal Conduct

30.    At all times material to this action, Epstein was an adult male. He was an extraordinarily wealthy individual, widely recognized as a billionaire, who used his wealth, power, resources, and apparent influence to commit heinous and illegal sex crimes and tortious acts against multiple victims in violation of federal and state laws, including the federal Trafficking Victims Protection Act ("TVPA"), as reauthorized and amended, and Florida's human trafficking law, Fla. Stat. Ann. §787.06.  Further, Epstein employed and/or conspired with other individuals and corporate entities to assist and facilitate him in committing those crimes and tortious acts and in seeking to prevent any reporting of these crimes and tortious acts.

31.    Epstein had a compulsive sexual preference for young or youthful looking females, some as young as 14 years old, and acted on that sexual preference for decades by preying on girls and young women.

32.    Epstein took pleasure in corrupting vulnerable and innocent girls and young or youthful looking women, including minor children, into engaging in sexual acts with him and others to whom he trafficked these girls and women.

33.    It was widely known among individuals regularly in Epstein's presence that he obtained pleasure from corrupting, coercing, and inducing vulnerable girls and young or youthful looking women, including minors, into engaging in uncomfortable and unwanted sexual acts for his own gratification as well as for the gratification of others to whom he trafficked these girls and young or youthful looking women.

34.     Epstein's illegal sexual activities were investigated by law enforcement on at least two occasions – in 2005-2008 by the United States Attorney for the Southern District of Florida, and in 2019 by the United States Attorney for the Southern District of New York.

35.     On July 2, 2019, the United States Attorney's Office for the Southern District of New York filed a Sealed Two Count Indictment including One Count of Sex Trafficking Conspiracy and One Count of Sex Trafficking for violations of 18 U.S.C. §1591.

36.     That Indictment (hereinafter "S.D.N.Y. Indictment") [annexed to this Complaint as **Exhibit A**] stated in part, and Plaintiff herein adopts as true, upon information and belief, and relevant to her Complaint, that "Jeffrey Epstein, the defendant, enticed and recruited, and caused to be enticed and recruited, minor girls to visit his mansion in Manhattan, New York (the "New York Residence") and his estate in Palm Beach, Florida (the "Palm Beach [Estate]") to engage in sex acts with him, after which the victims were given hundreds of dollars in cash."  Exh. A at 1.

37.     "Moreover, and in order to maintain and increase his supply of victims, Epstein also paid certain of his victims to recruit additional girls to be similarly abused by Epstein.  In this way, Epstein created a vast network of underage victims for him to sexually exploit in locations including New York and Palm Beach."  *Id*. at ¶ 2.

38.     In creating and maintaining this network of victims in multiple states to sexually abuse and exploit vulnerable young women and girls, Epstein worked and conspired with others, including employees and associates who facilitated his conduct by, among other things, contacting victims and scheduling their sexual encounters with Epstein at his New York Residence and at his Palm Beach Estate.  *Id*. at ¶¶ 4, 10-16

39.     The S.D.N.Y. Indictment further explained, and Plaintiff adopts and alleges as part of her claims, that, "[v]ictims were initially recruited to provide 'massages' to Epstein, which

would be performed nude or partially nude, would become increasingly sexual in nature, and would typically include one or more sex acts." *Id.* at ¶ 7. As will be described hereafter, the foregoing modus operandi closely matched the tactic Epstein employed against the Plaintiff herein.

40.     Epstein abused numerous victims by causing these victims to be recruited to engage in paid sex acts with him. *Id.*

41.     In addition to the specific allegations in the S.D.N.Y. Indictment, Epstein also utilized a similar, if not the same, scheme many years before the time period that was charged and many years after, as well as in additional geographical locations nationally and internationally.

### B.     Epstein's Rape, Sexual Assault, and Mutilation of Plaintiff

42.     In or about late 2006 or early 2007, Plaintiff, who was residing in Broward County, was employed as a real estate broker showing homes, villas, and townhouses for rent or purchase in the Palm Beach vicinity.

43.     Sometime thereafter, she was introduced to Epstein and Epstein's associate, agent, servant, and/or employee, who was introduced and known to Plaintiff as "G-Max", but whose actual name was Ghislaine Maxwell ("Maxwell"), at a barbeque hosted by Plaintiff's employer, who, upon information and belief, knew Epstein well.

44.     Plaintiff was told by her employer that Epstein was interested in renting or purchasing real property from him. However, she was instructed not to process Epstein's ID or other information and to proceed only on a cash basis. Thereafter, a transaction occurred relating to property that rented at a rate in excess of ten thousand ($10,000) dollars per month. The cash was provided directly to Plaintiff, as a real estate broker, in exchange for Epstein's right to use the property as he saw fit.

45.     At about this time, Maxwell provided Plaintiff with her personal telephone number and suggested to Plaintiff that Epstein would like to hire her. Initially, Plaintiff was not interested in this offer.

46.     Nevertheless, over the course of the year 2007, Maxwell began an extended effort of inducement, persuasion, and grooming of the Plaintiff to have her work for Epstein.

47.     This effort included, *inter alia,* the purchasing of expensive gifts for Plaintiff and promises that Epstein could get her highly placed employment.

48.     Ultimately, in or about the middle of the year 2007, Maxwell took the Plaintiff's passport from her for "safekeeping." Plaintiff later learned that her passport was held by Epstein in a locked box in his Palm Beach Estate. The passport was not returned to Plaintiff until May 2008.

49.     In early 2008, Plaintiff, persuaded by the persistent efforts of Maxwell, agreed to consider the prospect of working for Epstein.

50.     Shortly thereafter, it was arranged that Plaintiff, who was a skilled hairdresser, would go to Epstein's Palm Beach Estate to cut his hair and discuss employment opportunities.

51.     Plaintiff thereafter drove  to Epstein's Palm Beach Estate in early to mid-January 2008.

52.     When ushered into his presence, Epstein was completely naked, and he proceeded, with Maxwell's assistance, to brutally rape Plaintiff and otherwise sexually abuse Plaintiff.

53.     At that time and thereafter, Epstein had firearms in his possession which were in full view and displayed to Plaintiff for the purpose of frightening and intimidating her.

54.     At the conclusion of this initial rape and sexual assault, Epstein forced Plaintiff to accept roughly two hundred ($200) dollars in cash as "compensation."

55.     At this time, Plaintiff, in a traumatized condition, attempted to leave and stated her intention to report this crime to the police.

56.     In response, Maxwell purported to call the police herself, and shortly thereafter, two individuals, who claimed to be police officers, arrived and threatened to arrest Plaintiff and charge her with prostitution. They also threatened to take her young son away, and have Plaintiff and/or her son deported.

57.     Crediting and fearing these threats, and further crediting that these two individuals were in fact police officers, Plaintiff refrained thereafter from contacting law enforcement or commencing civil litigation out of fear for herself and her family.

58.     Immediately after this initial rape at Epstein's Palm Beach home, Maxwell and Epstein forced Plaintiff to drive with them, in Plaintiff's vehicle, where they picked up her young son and proceeded to a hotel in Naples, Florida,  approximately two hours away.

59.     During this travel, Plaintiff was visibly and uncontrollably crying. For the purposes of threatening and persuading Plaintiff from reporting Epstein's  criminal acts against her, Epstein and Maxwell stopped the car at a large body of water that was infested with alligators.

60.     Epstein then ushered the Plaintiff to the body of water and told her in explicit detail that, as had happened to other girls in the past, she would end up in this body of water and be devoured by the alligators, should she ever reveal what Epstein had done to her.

61.     Plaintiff credited this threat, and, until she learned of his death, she feared that Epstein would follow through on this explicit death threat.

62.     After leaving the alligator lake, Epstein and Maxwell proceeded to take Plaintiff and her young son to a hotel in Naples, Florida.

63.     There, over a period of several days, Epstein and Maxwell repeatedly raped and sexually abused Plaintiff, all in the presence of her son.

64.     During and through the next five months, until May 2008, Epstein and Maxwell initiated a "carrot and stick" approach to ensuring Plaintiff's silence and obtaining her further services.

65.     Between January and May 2008, Epstein repeatedly continued to threaten that he would (a) have Plaintiff arrested for prostitution, (b) have Plaintiff's son taken from her, (c) have Plaintiff deported, (d) have Plaintiff murdered or assaulted, (e) keep Plaintiff's passport from her, and (f) otherwise harm Plaintiff and her family. These criminal practices and techniques subjecting Plaintiff to force, fraud, and coercion precisely fit the findings in Florida's human trafficking statute (Fla. Stat. Ann §787.06(c)) delineating the panoply of practices and techniques commonly employed by traffickers to coerce and instill fear in their victims.

66.     While making these threats, Epstein emphasized his personal connections to many powerful actors within the legal system and elsewhere whom he asserted would not hesitate to act on his behalf.  For example, he claimed to have influence over the Federal Bureau of Investigation, the United States Department of Homeland Security's Department of Immigration and Customs Enforcement ("ICE"), and Florida state and local law enforcement.

67.     In one instance, Maxwell threatened Plaintiff that she would end up in the pond to be consumed by the alligators if she told anyone about the crimes committed against her.  These death threats terrified Plaintiff, especially given Epstein's claimed extensive network of powerful allies.

68.     In addition, at that time, as an alternative inducement for her silence and/or cooperation, Epstein and Maxwell purported to dangle the possibility of future employment

11

opportunities for the Plaintiff and/or her then husband with the FBI, which they falsely and fraudulently represented they were able to obtain.

69.     During this same time period in 2008, Plaintiff was trafficked by Epstein to a number of other men and forced by him to have unwanted sexual relations with such men. Among these other rapists was a heavy set older man who was introduced to Plaintiff as "Walter" and another older man who was identified to Plaintiff as a local judge.

70.     By compelling and forcing the Plaintiff to engage in unwanted commercial sex acts with other men for his personal benefit, Epstein violated numerous provisions of the TVPA as well as of Florida's human trafficking statute.

71.     Throughout these five harrowing months of rape, assault, and being sex trafficked to other men against her will, Plaintiff, who was of youthful appearance, had been admonished by Epstein to lie about her age and claim to be seventeen years old.

72.     In approximately early May 2008, in a particularly appalling act of savagery, Epstein forced Plaintiff to submit to unwanted and unnecessary vaginal surgery, performed, as best Plaintiff can recall, in a wealthy person's home by a man with a Russian accent, for the ostensible purpose of tightening her vagina and creating the false impression that she was a virgin for a "high profile" client.

73.     This violent and illegal procedure was botched, leaving Plaintiff mutilated, in pain, disabled, and permanently sexually dysfunctional.

74.     In addition, Plaintiff, who was and is a talented artist, was forced by Epstein to paint a nude picture of herself, which Epstein then sold and/or provided to a man in Mexico. Plaintiff suffers emotional distress daily from this fact, knowing that a revealing painting of her may well hang in the home of a total stranger.

75.     During this same time period in 2008, Epstein repeatedly photographed and videotaped Plaintiff naked and/or performing lewd activities. Among these films were ones which depicted Plaintiff playing golf while naked. This too continues to cause Plaintiff enormous mental anguish and distress.

### C.     Epstein's Coercion of Plaintiff

76.     Commencing prior to May 2008, as described above, and continuing to the present day, Epstein's coercive and explicit threats compelled the Plaintiff's silence.

77.     In furtherance of Epstein's unlawful enterprise, Epstein coerced the Plaintiff to conduct specific tasks and threatened her to remain silent. These tasks included driving young women, some of whom were believed to be minors, to various locations where, upon information and belief, Epstein's sex trafficking misconduct was perpetrated.

78.     Further, in or about April 2008, Epstein, through his associate, agent, servant, and/or employee Maxwell, also compelled Plaintiff to keep in her house a locked box with property that Epstein purportedly owned. Plaintiff was instructed that if she ever touched or opened that box she would be killed. She was also left with burner phones, wires, and other electronic devices that Epstein was seeking to conceal from discovery by law enforcement authorities.

79.     Eventually this box and the other materials were retrieved by Maxwell, without explanation or discussion, in or about May 2008.

80.     Plaintiff understood then, through the explicit and implicit repeated threats of Epstein and others working on behalf of and/or in concert with him, and continued to believe after last encountering Epstein, that if she ever publicly revealed any aspect of his rape, assault, sex trafficking, and other misconduct, to law enforcement, or by commencing a lawsuit, she would be murdered, physically harmed, or subjected to arrest, deportation, or loss of her child.

**D.      Epstein's Fraudulent Statements and Misrepresentations Directed to Plaintiff**

81.      Epstein, as well as other persons working on behalf of and/or in concert with him, made numerous and repeated false, fraudulent, and misleading statements and/or misrepresentations to Plaintiff to prevent or dissuade her from publicly revealing or commencing any action relating to Epstein's rape, sex assault, sex trafficking, and other misconduct victimizing Plaintiff.  These statements and misrepresentations included the following:

    a.  that Epstein possessed power or influence over the FBI, the Department of Homeland Security (including ICE), and Florida state and local law enforcement;

    b.  that the nature of Epstein's influence was such that, at his direction, one or more of these authorities would:

        i.  arrest Plaintiff and charge her with prostitution;

        ii.  bring irreparable shame to Plaintiff by falsely asserting that she was a prostitute;

        iii.  cause Plaintiff's child to be taken from her; and/or

        iv.  have Plaintiff deported.

    c.  that the individuals who arrived at Epstein's residence on the day of his initial rape of Plaintiff were in fact law enforcement officers who were prepared to take the above-described actions.

    d.  that Epstein or other persons working on behalf of and/or in concert with him would cause one or more of the law enforcement or governmental authorities described above to act upon these threats if Plaintiff ever revealed the criminal and tortious acts by Epstein alleged herein .

e.   that Epstein would inflict or cause others to inflict serious physical or even lethal harm on Plaintiff if she ever revealed the criminal and tortious acts by Epstein alleged herein.

82.   Given Epstein's wealth and apparent power, Plaintiff reasonably credited these claims and refrained from making complaints, filing charges, or seeking redress in a civil action as long as she believed Epstein was alive.

### E.   The Timeliness of Plaintiff's Claims (Equitable Tolling and Equitable Estoppel)

83.   Each and every one of the false or misleading acts and statements set forth above was made by Epstein himself, or through other persons working on behalf of and/or in concert with him, for the express purpose, *inter alia,* of preventing Plaintiff from commencing any lawsuit or claim against Epstein or his associates.

84.   Epstein intended to have Plaintiff rely upon these false and misleading acts and statements to her detriment.

85.   Epstein repeatedly threatened Plaintiff and her family. Specifically, as alleged above, Epstein as well as other persons working on behalf of and/or in concert with him threatened that they would use their influence to have her deported, to have her child taken into state custody, to have her arrested, and to have her physically harmed or murdered.

86.   Due to the severity of these threats, Plaintiff lived in constant fear until learning of Epstein's death in the summer of 2020, and  even today maintains a certain level of apprehension about associates of Epstein carrying through on the threats Epstein had made.

87.     Plaintiff, who reasonably was terrified by Epstein's threats and actions, credited and relied upon these false statements and conduct by refraining from filing any claim against Epstein or his associates.

88.     Plaintiff reasonably understood the potential consequences of these false statements to be ongoing in the years that followed, when, to the best of her belief, Epstein and his associates were continuing their criminal conduct and were motivated (and continued to be motivated) to avoid investigations, claims, and prosecution.

89.     Plaintiff did not learn about either Epstein's arrest or his death until the summer of 2020, when she learned that Maxwell had been arrested because Epstein's death was publicized in connection with that arrest.

**F.     Damages Sustained by Plaintiff as a Consequence of Epstein's Criminal and Tortious Misconduct**

90.     As a consequence of the above-described criminal and tortious force, fraud, and coercion against Plaintiff,  Plaintiff has suffered substantial damages, including:

a.     conscious pain and suffering;

b.     mental anguish;

c.     shame and humiliation;

d.     the destruction of her marriage;

e.     mutilation;

f.     permanent disability;

g.     the inability to enjoy sexual intimacy;

h.     lost income and employment opportunities;

i.     loss of enjoyment of life's pleasures;

    j.     sleep disorders; and

    k.    emotional distress relating to her child.

## COUNT I

### CAUSE OF ACTION FOR DAMAGES PURSUANT TO 18 U.S.C. § 1595, BASED ON VIOLATIONS OF 18 U.S.C. § 1591

91.    Plaintiff repeats and realleges all of the foregoing allegations as if set forth fully herein.

92.    Epstein, within the special territorial jurisdiction of the United States, in interstate and foreign commerce, and/or affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, solicited, threatened, forced, or coerced Plaintiff to engage in commercial sex acts.

93.    Such actions were undertaken knowing that his use of force, threats of force, fraud, coercion, and/or combinations of such means would be used, and were in fact used, in order to cause Plaintiff to engage in commercial sex acts. In doing so, Epstein violated 18 U.S.C. §1591.

94.    By virtue of Epstein's multiple violations of 18 U.S.C. § 1591, Defendants Indyke and Kahn, as co-executors of the Estate of Jeffrey E. Epstein, are subject to civil causes of action under 18 U.S.C. § 1595 by Plaintiff, who is a victim of the violations. As a direct and proximate result of Epstein's commission of the aforementioned criminal offenses enumerated in 18 U.S.C .§ § 1591, Plaintiff has suffered and will continue to suffer injury and pain; emotional distress; mutilation; disability; psychological and psychiatric trauma; mental anguish; humiliation; embarrassment; loss of self-esteem; loss of dignity; loss of enjoyment of life; loss of income; invasion of privacy; and other damages caused by Epstein's criminal actions.

Plaintiff will also incur further medical and mental health expenses.  These injuries are permanent in nature, and Plaintiff will continue to suffer from them in the future.

95.    Plaintiff has been required to retain counsel to enforce her rights under this section. Defendants are obligated to pay Plaintiff her reasonable attorney's fees pursuant to 18 U.S.C. § 1595(a).

WHEREFORE, Plaintiff demands judgment against Defendants Indyke and Kahn as co-executors of the Estate of Jeffrey E. Epstein for compensatory and general damages, attorney's fees, forfeiture, punitive damages, and such other and further relief as this Court deems just and proper.  Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

## COUNT II

### CAUSE OF ACTION FOR DAMAGES PURSUANT TO 18 U.S.C. § 1595, BASED ON VIOLATIONS OF 18  U.S.C. § 1590

96.  Plaintiff  repeats and realleges  all of the foregoing allegations as if set forth fully herein.

97.  Epstein engaged in the labor trafficking of Plaintiff by knowingly recruiting, harboring, transporting, providing, and/or obtaining Plaintiff's labor and services in violation of 18 U.S.C.§1590.

98.    By virtue of Epstein's violations of 18 U.S.C. § 1590,  Defendants Indyke and Kahn, as co-executors of the Estate of Jeffrey E. Epstein, are subject to civil causes of action under 18 U.S.C. § 1595 by Plaintiff, who is a victim of the violations.

99.  As a direct and proximate result of Epstein's commission of the aforementioned criminal offenses enumerated in 18 U.S.C. §1590, Plaintiff has suffered  and  will  continue to  suffer  injury  and  pain;  emotional  distress; psychological and psychiatric trauma; mental anguish; humiliation; confusion; embarrassment; loss of self-esteem; loss of dignity;

loss of enjoyment of life; loss of income; invasion of privacy; and other damages caused by Epstein's criminal actions. Plaintiff will also incur further medical and mental health expenses. These injuries are permanent in nature, and Plaintiff will continue to suffer from them in the future.

100. Plaintiff has been required to retain counsel to enforce her rights under this section. Defendants are obligated to pay the Plaintiff her reasonable attorneys' fees pursuant to 18 U.S.C. § 1595(a).

WHEREFORE, Plaintiff demands judgment against Defendants Indyke and Kahn as co-executors of the Estate of Jeffrey E. Epstein for compensatory and general damages, attorney's fees, forfeiture, punitive damages, and such other and further relief as this Court deems just and proper. Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

## COUNT III

### CAUSE OF ACTION FOR DAMAGES PURSUANT TO 18 U.S.C. § 1595, BASED ON VIOLATIONS OF 18 U.S.C. § 1592(a)

101. Plaintiff repeats and realleges all of the foregoing allegations as if set forth fully herein.

102. Epstein, directly or through one of his agents, knowingly concealed, removed, confiscated, and possessed Plaintiff's passport in the course of one or more violations of 18 U.S.C. §§ 1591 and 1594(a).

103. Epstein, directly or through one of his agents, knowingly concealed, removed, confiscated, and possessed Plaintiff's passport with intent to violate 18 U.S.C. §§ 1591 and 1594(a).

104.   By virtue of Epstein's violations of 18 U.S.C. §§ 1592(a),  Defendants Indyke and Kahn, as co-executors of the Estate of Jeffrey E. Epstein, are subject to civil causes of action under 18 U.S.C. § 1595 by Plaintiff, who is a victim of the violations.

105. As a direct and proximate result of Epstein's commission of the aforementioned criminal offenses enumerated in 18 U.S.C .§ § 1592, Plaintiff has suffered  and  will  continue to  suffer  injury  and  pain;  emotional  distress; mutilation; disability; psychological and psychiatric trauma; mental anguish; humiliation; confusion; embarrassment; loss of self-esteem;  loss  of  dignity;  loss  of  enjoyment  of  life; loss of income; invasion of privacy; and other damages caused by Epstein's criminal actions.  Plaintiff will also incur further medical and mental health expenses.  These injuries are permanent in nature, and  Plaintiff  will  continue  to suffer from them in the future.

106. Plaintiff has been required to retain counsel to enforce her rights under this section. Defendants are obligated to pay the Plaintiff her reasonable attorneys' fees pursuant to 18 U.S.C. § 1595(a).

WHEREFORE, Plaintiff demands judgment against Defendants Indyke and Kahn as  co-executors  of  the  Estate  of  Jeffrey  E.  Epstein  for  compensatory  and  general  damages, attorney's fees, forfeiture, punitive damages, and such other and further relief as this Court deems just and proper.  Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

## COUNT IV

## CAUSE OF ACTION FOR DAMAGES PURSUANT TO 18 U.S.C. § 1595, BASED ON VIOLATIONS OF 18  U.S.C. §§ 1593A

107. Plaintiff  repeats and realleges  all of the foregoing allegations as if set forth fully herein.

108. In trafficking the Plaintiff and forcing and/or compelling her to assist in the trafficking of others, Epstein knowingly benefitted financially and received value in furtherance of his violations of the TVPA, in violation of 18 U.S.C. §1593A.

109. Specifically, Epstein gained power, access, and other value from the trafficking of Plaintiff to persons of power and influence, and, upon information and belief, benefitted financially from these crimes as well as receiving personal sexual gratification from sexually assaulting and raping the Plaintiff.

110. By virtue of Epstein's multiple violations of 18 U.S.C. §1593A, Defendants Indyke and Kahn, as co-executors of the Estate of Jeffrey E. Epstein, are subject to civil causes of action under 18 U.S.C. § 1595 by Plaintiff, who is a victim of the violations.

111. As a direct and proximate result of Epstein's commission of the aforementioned criminal offenses enumerated in 18 U.S.C. § § 1593A, Plaintiff has suffered and will continue to suffer injury and pain; emotional distress; mutilation; disability; psychological and psychiatric trauma; mental anguish; humiliation; embarrassment; loss of self-esteem; loss of dignity; loss of enjoyment of life; loss of income; invasion of privacy; and other damages caused by Epstein's criminal actions. Plaintiff will also incur further medical and mental health expenses. These injuries are permanent in nature, and Plaintiff will continue to suffer from them in the future.

112. Plaintiff has been required to retain counsel to enforce her rights under this section. Defendants are obligated to pay Plaintiff her reasonable attorney's fees pursuant to 18 U.S.C. § 1595(a).

WHEREFORE, Plaintiff demands judgment against Defendants Indyke and Kahn as co-executors of the Estate of Jeffrey E. Epstein for compensatory and general damages,

attorney's fees, forfeiture, punitive damages, and such other and further relief as this Court deems just and proper.  Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

## COUNT V

### CAUSE OF ACTION FOR DAMAGES PURSUANT TO 18 U.S.C. § 1595, BASED ON VIOLATIONS OF 18  U.S.C. §§ 1594 (a) and (c)

113. Plaintiff  repeats and realleges  all of the foregoing allegations as if set forth fully herein.

114. Epstein, within the special territorial jurisdiction of the United States, in interstate and foreign commerce, and/or affecting interstate and  foreign  commerce,  attempted to violate 18 U.S.C. §§ 1590 and 1591 in violation of 18 U.S.C. § 1594(a).

115.  Epstein conspired with other persons working on  behalf of and/or in concert with him, including Ghislaine Maxwell, to  violate 18 U.S.C. §§ 1590 and 1591 in violation of 18 U.S.C. § 1594(c).

116.  By virtue of Epstein's  multiple  violations of 18 U.S.C. §§ 1594(a) and (c), Defendants Indyke and Kahn,  as  co-executors of the Estate of Jeffrey E. Epstein, are subject to civil causes of action under 18 U.S.C. § 1595 by Plaintiff, who is a victim of the violations.

117. As a direct and proximate result of Epstein's commission of the aforementioned criminal  offenses  enumerated  in  18  U.S.C. § § 1594(a) and (c), Plaintiff has suffered  and  will continue  to  suffer  injury  and  pain;  emotional  distress; mutilation; disability; psychological and  psychiatric  trauma;  mental  anguish;  humiliation;  embarrassment;  loss  of  self-esteem; loss  of  dignity;  loss  of  enjoyment  of  life; loss of income; invasion of privacy;  and other damages caused by Epstein's criminal actions.  Plaintiff will also incur further medical and mental

health expenses.  These injuries are permanent in nature, and Plaintiff will continue to suffer from them in the future.

118. Plaintiff has been required to retain counsel to enforce her rights under this section. Defendants are obligated to pay Plaintiff her reasonable attorney's fees pursuant to 18 U.S.C. § 1595(a).

WHEREFORE, Plaintiff demands judgment against Defendants Indyke and Kahn as co-executors of the Estate of Jeffrey E. Epstein for compensatory and general damages, attorney's fees, forfeiture, and such other and further relief as this Court deems just and proper. Plaintiff reserves her right to seek punitive damages upon a record showing of entitlement to such damages.  Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

## COUNT VI

### CAUSE OF ACTION FOR DAMAGES
### FOR RAPE AND SEXUAL ASSAULT

119.  Plaintiff  repeats and realleges and incorporates  by  reference  all of the foregoing as if set forth fully herein.

120.  Epstein personally, and acting in concert with others, caused Plaintiff to be sexually assaulted and raped on numerous occasions and for prolonged periods of time.

121. This brutal and depraved criminal misconduct was knowing, intentional, and/or reckless.

122. As a direct and proximate result of Epstein's commission of the aforementioned criminal offenses and tortious misconduct, Plaintiff has in the past suffered and will continue to suffer injury and pain; emotional distress; mutilation; disability; psychological  and  psychiatric trauma;  mental anguish; humiliation; embarrassment;  loss of  self-esteem;  loss of dignity;  loss of  enjoyment  of  life's pleasures; loss of income;  invasion of privacy;  and other damages

associated with Epstein's actions.  Plaintiff will incur further medical and mental health expenses. These injuries are permanent in nature and Plaintiff will continue to suffer from them in the future.

WHEREFORE, Plaintiff demands judgment against the co-executors of the Estate of Jeffrey E. Epstein for compensatory and general damages, forfeiture, and such other and further relief as this Court deems just and proper.  Plaintiff reserves her right to seek punitive damages upon a record showing of entitlement to such damages.  Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

## COUNT VII

## CAUSE OF ACTION FOR DAMAGES FOR BATTERY

123. Plaintiff  repeats and realleges and incorporates  by  reference  all of the foregoing as if set forth fully herein.

124. The aforesaid misconduct and criminal violations, including the mutilation of Plaintiff in a purported medical procedure constitutes and assault or battery upon Plaintiff in that it was an unwanted and violent touching of her person.

125. This brutal and depraved and criminal misconduct was knowing, intentional, and reckless.

126. As a direct and proximate result of Defendants' commission of the aforementioned criminal  offenses and tortious misconduct, Plaintiff has in the past suffered and will continue to suffer injury and pain; emotional distress; mutilation; disability; psychological  and  psychiatric trauma;  mental anguish; humiliation; embarrassment;  loss  of  self-esteem;  loss  of  dignity;  loss

24

of enjoyment of life's pleasures; loss of income; invasion of privacy; and other damages associated with Epstein's actions. Plaintiff will incur further medical and mental health expenses. These injuries are permanent in nature and Plaintiff will continue to suffer from them in the future.

WHEREFORE, Plaintiff demands judgment against the co-executors of the Estate of Jeffrey E. Epstein for compensatory and general damages, forfeiture, and such other and further relief as this Court deems just and proper. Plaintiff reserves her right to seek punitive damages upon a record showing of entitlement to such damages. Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

**COUNT VIII**

**CAUSE OF ACTION FOR DAMAGES FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

127. Plaintiff repeats and realleges and incorporates by reference all of the foregoing as if set forth fully herein.

128. The misconduct described above was intentional, outrageous, sadistic, and depraved. The foregoing alleged conduct is utterly intolerable in a civilized society.

129. Defendants knew and/or intended this conduct to cause Plaintiff severe and profound emotional distress, humiliation, lack of self-worth, as well as lifelong suffering.

130. As a direct and proximate result of Defendants' commission of the aforementioned criminal offenses and tortious misconduct, Plaintiff has in the past suffered and will continue to suffer injury and pain; emotional distress; mutilation; disability; psychological and psychiatric trauma; mental anguish; humiliation; embarrassment; loss of self-esteem; loss of dignity; loss of enjoyment of life's pleasures; loss of income; invasion of privacy; and other damages

associated with Epstein's actions.  Plaintiff will incur further medical and mental health expenses. These injuries are permanent in nature and Plaintiff will continue to suffer from them in the future.

WHEREFORE, Plaintiff demands judgment against the co-executors of the Estate of Jeffrey E. Epstein for compensatory and general damages, forfeiture, and such other and further relief as this Court deems just and proper.  Plaintiff reserves her right to seek punitive damages upon a record showing of entitlement to such damages.  Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

## COUNT IX

### CAUSE OF ACTION FOR DAMAGES FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

131. Plaintiff  repeats and realleges and incorporates  by  reference  all of the foregoing as if set forth fully herein.

132. The misconduct described above was outrageous, sadistic, depraved, reckless, and/or negligent. The foregoing alleged conduct is utterly intolerable in a civilized society.

133. Defendants knew or should have known that this conduct to cause Plaintiff severe and profound emotional distress, humiliation, lack of self-worth, as well as lifelong suffering.

134. As a direct and proximate result of Defendants' commission of the aforementioned criminal  offenses and tortious misconduct, Plaintiff has in the past suffered and will continue to suffer injury and pain; emotional distress; mutilation; disability; psychological  and  psychiatric trauma;  mental anguish; humiliation; embarrassment;  loss  of  self-esteem;  loss  of  dignity;  loss of  enjoyment  of  life's pleasures; loss of income; invasion of privacy;  and other damages

associated with Epstein's actions. Plaintiff will incur further medical and mental health expenses. These injuries are permanent in nature and Plaintiff will continue to suffer from them in the future.

WHEREFORE, Plaintiff demands judgment against the co-executors of the Estate of Jeffrey E. Epstein for compensatory and general damages, forfeiture, and such other and further relief as this Court deems just and proper. Plaintiff reserves her right to seek punitive damages upon a record showing of entitlement to such damages. Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

## COUNT X

### CAUSE OF ACTION OR DAMAGES
### FOR FRAUD AND MISREPRESENTATION

135. Plaintiff repeats and realleges and incorporates by reference all of the foregoing as if set forth fully herein.

136. Epstein's words and conduct, and the words and conduct of others working on his behalf and/or in concert with him, as described above, included, *inter alia,* the following statements or representations that were false, fraudulent, dishonest, reckless and/or negligently misleading:

a. That Epstein possessed great influence over the FBI, ICE, and both Florida State and local law enforcement;

b. That each and every one of those agencies were prepared to act unlawfully on his behalf to cause grave harm to Plaintiff;

c. That among the specific harms these agencies were prepared to inflict on Plaintiff at Epstein's request were:

i.      Arresting Plaintiff on charges of prostitution;

ii.     Taking Plaintiff's child away from her; and

iii.    Having Plaintiff deported.

d.      That the individuals summoned to Epstein's house on the day of his first assault and rape of Plaintiff, were in fact law enforcement officers who were prepared to unlawfully act in the manner set forth above.

e.      That he and his colleagues were in possession of firearms and were prepared, if necessary, to assault or kill her.

137. Epstein further falsely stated on more than one occasion that if Plaintiff ever a) made complaint to any law enforcement agency or the CIA respecting his criminal or tortious misconduct; b) filed a civil lawsuit seeking to recover damages as a consequence of this misconduct; or c) took any other steps to publicize or complain of this misconduct, then one or more of the adverse consequences described above would occur.

138. Epstein engaged in this conduct and made these fraudulent statements and misrepresentations with the intention and expectation or in disregard of the substantial likelihood that she would credit and rely on them to her detriment.

139. Plaintiff, *inter alia* terrified for her life, fearful of losing her child, being charged with prostitution, or being deported credited these fraudulent statements and misrepresentations.

140. As a consequence, Plaintiff, for many years, to her potential and actual harm and detriment, refrained from bringing criminal or civil complaints against Epstein, and took no other steps to publicize Epstein's criminal and tortious misconduct.

141. As a direct and proximate result of Defendants' commission of the aforementioned criminal offenses and tortious misconduct, Plaintiff has in the past suffered and will continue to

suffer injury and pain; emotional distress; mutilation; disability; psychological and psychiatric trauma; mental anguish; humiliation; embarrassment; loss of self-esteem; loss of dignity; loss of enjoyment of life's pleasures; loss of income; invasion of privacy; loss of the opportunity to file suit at an earlier time and was otherwise damaged. Plaintiff will incur further medical and mental health expenses. These injuries are permanent in nature and Plaintiff will continue to suffer from them in the future.

WHEREFORE, Plaintiff demands judgment against the co-executors of the Estate of Jeffrey E. Epstein for compensatory and general damages, forfeiture, and such other and further relief as this Court deems just and proper. Plaintiff reserves her right to seek punitive damages upon a record showing of entitlement to such damages. Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

Dated: March 22, 2021                          Respectfully submitted,

                                               COFFEY | BURLINGTON
                                               2601 South Bayshore Drive, Penthouse
                                               Miami, Florida 33133
                                               T. 305-858-2900
                                               F. 305-858-5261

                                               By: _/s/ Dorothy C. Kafka_____
                                               Robert K. Burlington (FBN 261882)
                                               Andrew H. Marks (FBN 225231)
                                               Dorothy C. Kafka (FBN 1007982)
                                               rburlington@coffeyburlington.com
                                               amarks@coffeyburlington.com
                                               dkafka@coffeyburlington.com
                                               groque@coffeyburlington.com
                                               service@coffeyburlington.com

                                               and

                                               PHILLIPS & PAOLICELLI, LLP
                                               747 Third Avenue, 6th Floor

New York, NY 10017
T. 212-388-5100
F. 212-388-5200

Steven J. Phillips**
Victoria E. Phillips**
Ari L. Taub, Esq.**
SPhillips@p2law.com
VPhillips@p2law.com
ATaub@P2law.com

** *Pro hac vice application
   forthcoming*